COMMONWEALTH *vs.* VINCENT A. LAVENDIER.

No. 10-P-78.

Barnstable. February 16, 2011. - May 12, 2011.

Present: LENK, SMITH, & MILKEY, JJ.

*Motor Vehicle,* Operating under the influence. *Practice, Criminal,* Voluntariness of statement, Motion for a required finding. *Evidence,* Voluntariness of statement, Intoxication.

A District Court judge properly denied the criminal defendant's pretrial motion to suppress incriminating statements that he made to police officers prior to his arrest, where the defendant was not in custody when he made the statements, in that the location of the interrogation was a neutral site; the officers' questions were investigatory in nature and not accusatory; the nature of the interrogation was not coercive; and although the officers declined the defendant's request that they leave a place that was not his home, thereby providing some suggestion that he was not at that point free to terminate the interview, the officers' refusal to leave did not carry the same coercive force as it might have had it been the defendant's home. [503-506]

The evidence at a criminal trial was sufficient to convict the defendant of operating a motor vehicle while under the influence of intoxicating liquor. [506-507]

COMPLAINT received and sworn to in the Orleans Division of the District Court Department on October 1, 2008.

A pretrial motion to suppress evidence was heard by *Don L. Carpenter,* J., and the case was tried before him.

*Amy M. Belger* for the defendant.

*Robert D. Moriarty,* Assistant District Attorney, for the Commonwealth.

MILKEY, J. After a jury trial, the defendant was convicted of operating under the influence of intoxicating liquor, third offense (G. L. c. 90, § 24[1][*a*][1]). On appeal, he primarily argues that a District Court judge erred by denying his motion to suppress certain incriminating statements that he made to the police

prior to his arrest. He also argues that the evidence at trial was insufficient to support the jury's verdict. We affirm.[1]

1. *Motion to suppress.* Through the statements at issue, the defendant effectively acknowledged that he was intoxicated and that he had driven the truck found at the scene. The determinative issue is whether the defendant was already in "custody" when he made those statements. See *Commonwealth* v. *Morse*, 427 Mass. 117, 122 (1998) ("Miranda warnings are only necessary where one is subject to 'custodial interrogation' "). In addressing that issue, we accept the motion judge's findings of fact absent clear error (and the defendant alleges none), but we make our own assessment of the judge's application of constitutional principles to the facts found. *Commonwealth* v. *Mello*, 420 Mass. 375, 381 n.8 (1995).

The motion judge found the following facts. Just before midnight on September 30, 2008, the Orleans police received an anonymous tip that a white pickup truck was driving erratically and "striking things" in the vicinity of Great Oak Road. A few minutes later, they received a call from the same tipster that a man in a particular residence there was yelling out a woman's name. In response to the calls, a police officer arrived at a private residence at 80 Great Oak Road, where he found a chaotic and confusing scene. A white pickup truck was pulled up to the front door of the house and on the lawn. There were tire tracks in the dirt and the dew on the lawn had been disturbed, and the officer detected the scent of burning brakes emanating from the truck. He heard "breaking and smashing noises coming from inside the house" and "observed smashed windows and a toilet that seemed to be hanging outside one window."

---

[1]The defendant was also convicted of negligent operation of a motor vehicle (G. L. c. 90, § 24[2][*a*]) and malicious destruction of property having a value of more than $250 (G. L. c. 266, § 127). As the Commonwealth has conceded, and we agree, that the evidence was insufficient as matter of law to warrant a conviction of malicious destruction of property, we reverse that conviction. The charge of negligent operation of a motor vehicle was placed on file with the defendant's consent and that conviction is therefore not before us. See *Commonwealth* v. *Qualls*, 440 Mass. 576, 577 n.1 (2003), citing *Commonwealth* v. *Delgado*, 367 Mass. 432, 438 (1975) ("Absent exceptional circumstances, we do not consider appeals . . . on indictments placed on file since no appeal may come before us until after judgment, which in criminal cases is the sentence"). See also Reporters' Notes (2008) to Mass.R.Crim.P. 28(e), Mass. Ann. Laws Court Rules, Rules of Criminal Procedure, at 1612 (LexisNexis 2010).

The officer, joined by a second officer, proceeded inside to the kitchen of the home, where they found "a tipped over gas stove, broken items, and the defendant holding the refrigerator at a 45 degree angle." The defendant initially told the police "he owned the house, then he said his aunt owned the house and that he was doing renovations, and then he said it was his cousin Mike's house" (a statement that ultimately proved to be true). The police convinced the defendant to step away from the refrigerator "for everyone's safety," and they "asked him to sit down at a table in the dining room away from the kitchen." As the defendant entered the dining room, he expressed a reluctance to have the police join him there, because there was "contraband" there that was his. The police nevertheless joined him in the dining room and continued with their questions as they tried to get to the bottom of what was going on.

From start to finish, the interview of the defendant lasted only ten to fifteen minutes. During the questioning, the defendant was seated at the table (where the referenced "contraband," a small amount of marijuana, lay) and the police "were standing at the sides of the table." At one point, a third officer, a sergeant, joined them. The sergeant questioned the defendant about whether he had driven and whether he had consumed alcohol. The defendant responded that he had driven from Newport, Rhode Island, and that he had not had anything to drink since he arrived at the house. He also stated he started to destroy things when he arrived. The officers' suspicions were further aroused when they noticed that the defendant was not in any photographs adorning the walls and that mail there was not addressed to him, and when they learned from dispatch that the truck was registered to a different address and that someone else owned the house. The defendant also could not produce a key to the property when asked. The defendant at some point stood up and announced that he was "cocked"[2] and that he was going to strangle one of the officers and kill another. He was then arrested.

The Supreme Judicial Court has instructed that we are to consider four factors in assessing the question of custody:

"(1) the place of the interrogation; (2) whether the officers

---

[2]The judge found that the defendant said he was "cooked," but the testimony from the suppression hearing (and at trial) was that he said "cocked."

have conveyed to the person being questioned any belief or opinion that the person is a suspect; (3) the nature of the interrogation, including whether the interview was aggressive or, instead, informal and influenced in its contours by the person being interviewed; and (4) whether, at the time the incriminating statement was made, the person was free to end the interview by leaving the locus of the interrogation or by asking the interrogator to leave, as evidenced by whether the interview terminated with an arrest."

*Commonwealth* v. *Groome*, 435 Mass. 201, 211-212 (2001). "[T]he initial determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." *Commonwealth* v. *Morse*, 427 Mass. at 124, quoting from *Stansbury* v. *California*, 511 U.S. 318, 323 (1994).

a. *Place of interrogation.* The location of the interrogation was a neutral site. The defendant was questioned in a room with multiple exits, and the door to the house was "wide open." Although this setting was different from the typical roadside confrontation, where one is in the open and visible to passersby, it is far from the coercive atmosphere of a police interrogation room. Moreover, it appeared to be a place familiar to the defendant; he evidently knew the house's owner and was comfortable enough to leave his marijuana in the next room.

b. *Focus of the investigation.* The officers' questions were investigatory in nature, not accusatory, and the fact that the defendant made incriminatory statements did not render the interrogation custodial. "There is no requirement that warnings be given prior to '[g]eneral on-the scene questioning as to facts surrounding a crime or other general questioning of citizens in the fact-finding process.' " *Commonwealth* v. *Merritt*, 14 Mass. App. Ct. 601, 604 (1982), quoting from *Miranda* v. *Arizona*, 384 U.S. 436, 477 (1966). The defendant's assertion is incorrect that once he admitted to possessing the contraband in the dining room — a criminal offense at the time — he was necessarily in custody. See *Commonwealth* v. *Cameron*, 44 Mass. App. Ct. 912, 914 (1998) ("The fact that the defendant's responses to some of the on-the-scene questions were admissions does not

convert the interview into a custodial interrogation"). We look for a "fundamental transformation in the atmosphere" on the part of the police in such a situation. *Commonwealth* v. *Hilton,* 443 Mass. 597, 612-613 (2005) (although defendant made remark to effect that her son would never forgive her, officer's question, "Why don't you tell us what happened?" did not transform questioning into custodial interrogation).[3] There was no such transformation here. Even when the sergeant arrived and asked the defendant whether he had driven and whether he had been drinking, this line of questioning was akin to a traffic stop, which is regularly held to be noncustodial for *Miranda* purposes. See, e.g., *Commonwealth* v. *Samneang Ka,* 70 Mass. App. Ct. 137, 140 (2007) ("general on-scene questioning . . . , including a question whether the driver has been drinking," does not amount to custody). Moreover, although the officers at some point learned that the defendant did not own the property, there is no indication that he became aware that they knew this.

c. *Nature of the interrogation.* The nature of the questioning was not coercive. Although the defendant was seated while the three police officers "were standing at the sides of the table," the entire encounter was brief (lasting only ten to fifteen minutes), the defendant was never physically restrained, there was no evidence that the officers brandished their weapons, and the questioning never became aggressive.[4] The interview remained investigatory in nature, and the officers never conveyed to the defendant that they believed he had committed a crime.

d. *Freedom to end interview.* The officers testified at the suppression hearing that they would not have let the defendant leave mid-interview, and he was eventually arrested (albeit only after threatening to kill two of the officers). However, the test for custody is not whether the defendant was in fact free to

---

[3]See *Commonwealth* v. *Bryant,* 390 Mass. 729, 738-740 (1984) (defendant's statement, "I did it, I shot him," did not transform situation into custodial interrogation, although it "sharpen[ed] substantially his status as a suspect," and although court assumed police had probable cause to arrest and would not have let him leave, court concluded that inquiry as to whether defendant had anything more to say did not create custodial atmosphere).

[4]The interview included jocular banter between the defendant and sergeant: the defendant asked the officers if they liked how he got up on the lawn, and the sergeant asked whether he used two- or four-wheel drive, to which the defendant responded, "[T]wo-wheel drive, 'cause [I'm] good."

leave. Instead, we are concerned with how a reasonable person in the defendant's position would have perceived the situation. *Commonwealth* v. *Simon*, 456 Mass. 280, 287, cert. denied, 131 S. Ct. 181 (2010). Here, the officers never told the defendant he was not free to go, and at no time did he attempt to leave. An officer testified at the motion hearing that at one point the defendant told him to "get the fuck out of there," which, as defense counsel acknowledged at oral argument, was some evidence that the defendant up to that point perceived that he was not in custody. To be sure, the officers did not heed that demand, providing at least some suggestion that the defendant was at that point not free to terminate the interview. Notably, however, the defendant knew that this was not his home (and that he had no right to demand that the police leave), and he knew (or should have known) that the police had doubt that this was his home. Therefore, the officers' declining his request to leave did not carry the same coercive force as it might have had had this been the defendant's home, and it did not by itself transform the interview into a custodial one.

Weighing all of the relevant facts, and cognizant that no one factor is dispositive, see *Commonwealth* v. *Magee*, 423 Mass. 381, 386 (1996), we conclude that the defendant was not in custody when the police officers questioned him. Therefore, we affirm the order denying his motion to suppress.[5]

2. *Sufficiency of the evidence.* Viewing the evidence in the light most favorable to the Commonwealth and drawing all reasonable inferences therefrom, *Commonwealth* v. *Latimore*, 378 Mass. 671, 676-678 (1979), we conclude that there was sufficient evidence to convict the defendant of operating under the influence. In addition to the defendant's own statements (e.g., that he was "cocked," that he had not had anything to drink since arriving at the property, and that he drove the truck to the property), there were obvious signs of his intoxication (slurred speech, belligerent demeanor, strong odor of alcohol, poor bal-

---

[5]The defendant's statements that he was "cocked" and that he "got up on the lawn" seem to have been spontaneously volunteered and therefore may not be subject to suppression for that reason. See *Commonwealth* v. *Ferrer*, 68 Mass. App. Ct. 544, 546 (2007) ("A statement made spontaneously, and not in response to statements that would be perceived as interrogation, is not subject to suppression"). However, we need not resolve this issue.

ance, and glassy, bloodshot eyes), as well as plenty of circumstantial evidence that he had just driven the truck there.[6] Thus, although a defendant's admission that he had driven under the influence cannot alone sustain his conviction, see *Commonwealth v. Forde*, 392 Mass. 453, 457-458 (1984), there was ample evidence to corroborate the defendant's statements.

On the charge of operating under the influence of intoxicating liquor (third offense), the judgment is affirmed. On the charge of malicious destruction of property, the judgment is reversed, the verdict is set aside, and judgment is to enter for the defendant.

*So ordered.*

---

[6]The truck had been stopped on the lawn precariously close to the residence (supporting the inference that he was intoxicated while traveling to the property); the truck was registered to him and he was in close proximity to it; and there were fresh tire tracks on the lawn, disturbed dew, and a burning scent coming from the vehicle (all indicating that the truck had recently been operated). In addition, there was no reason to suggest that anyone else had operated the truck. Contrast *Commonwealth* v. *Leonard*, 401 Mass. 470, 471-473 (1988).